Filed 2/8/24  P. v. Lewis CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093575 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE012489) |
| v. | |
| EDWARD LEWIS et al., | |
| Defendants and Appellants. | |

This case arises from violence between two feuding groups, "Squad" and "Heem." Defendant Danquail Laquinn Jones, a member of Heem, used a 15-year-old girl's Snapchat account to lure Squad member D.W.[1] to meet outside, where another Heem member shot D.W., killing him.  When Jones learned that the girl, M.F., had become aware that her Snapchat account was used to bait the victim, Jones decided that M.F. also

---

[1]    To protect their privacy, we refer to the victims and witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(4), (10.)

1

must die.  Jones instructed his codefendant Edward Lewis to retrieve a gun and kill M.F. (who was Lewis' ex-girlfriend).  Lewis and three others obtained a gun and drove M.F. to a park, where Lewis shot her twice, injuring her.  In a joint trial, the jury found Jones guilty of murdering D.W. and conspiring to murder both victims.  It found Lewis guilty of conspiracy to murder M.F., and of the attempted murder of M.F.

Both defendants appeal.  Lewis argues that the trial court abused its discretion by permitting a joint trial and by admitting a wealth of damaging character evidence, resulting in a trial that was fundamentally unfair.  Alternatively, Lewis seeks remand for resentencing under Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) (Stats. 2021, ch. 441, § 1), and because the trial court failed to adequately consider his youth and childhood trauma at sentencing.  Jones, in turn, argues that the trial court erred by admitting evidence of prior uncharged acts, that the judgment must conditionally be reversed for a juvenile transfer hearing under Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill 2361) (Stats. 2022. ch. 330, § 1), and that his sentence of 52 years to life amounts to cruel and unusual punishment.

We conclude the trial court abused its discretion by admitting certain irrelevant and inflammatory evidence at Lewis' trial, and that the error was not harmless.  We accordingly vacate Lewis' judgment and remand for further proceedings in the trial court.  With respect to Jones, we agree that Assembly Bill 2361 requires a conditional reversal and remand to the juvenile court for a new transfer hearing under the amended standard.  If the juvenile court transfers the matter back to criminal court, then Jones' judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Murder of D.W.*

In 2016, two rival groups existed at Sheldon High School:  Heem and Squad. Heem and Squad were not validated street gangs, but they functioned in a gang-like

2

manner. Defendant Jones was a member of Heem and had an ongoing conflict with 17-year-old D.W., aka "Tru or Almighty Tru," who belonged to Squad. Codefendant Lewis also attended Sheldon High School in 2016 but was not a member of Heem or Squad. Lewis was, however, close friends with at least one member of Heem.

On June 22, 2016, around 7:00 p.m., Jones sent a text message to 15-year-old M.F., another student at Sheldon High. Jones asked M.F. if she was "cool" with D.W., and requested her Snapchat login credentials so Jones could get a hold of him. M.F. gave Jones her login information. Around 11:00 p.m. that night or 12:00 a.m., Jones told M.F. to delete their text messages and keep quiet about their communications.

At 11:29 p.m. on June 22, 2016, a screenshot was taken of the conversation D.W. was having with Jones via M.F.'s Snapchat account. During this exchange, Jones asked D.W. if he wanted to "kick it," a slang term meaning hang out. Jones, acting as M.F. through her Snapchat account, offered to pick up D.W. and indicated that he was with "three 3 females." D.W. messaged his friend T.L. to see if he knew M.F., writing "Bitches be trying to get me popped i dont trust." T.L. assured D.W. that "She not with the activities." D.W. responded to M.F. (Jones) that he was going to take a screenshot to "show bruh and come to me." At 11:38 p.m., D.W.'s account sent a message to M.F.'s account stating, "It's dam [*sic*] he said something like 4901 [H]arrow [D]r[ive]." D.W. communicated with his friends over FaceTime and text messages and asked one friend if he wanted to "kick it with some females."

At 12:40 a.m., Jones, sent another message through M.F.'s Snapchat account to D.W. stating, "K, come out." D.W.'s account responded, "Aight." D.W. told his friends over FaceTime that the girls had arrived to pick him up and ended the FaceTime call. At 12:43 a.m., a Sacramento police officer was dispatched to the intersection of Harrow Drive and Edgeware Way to investigate gunshots. At the scene, the officer saw a trail of blood leading up to D.W., who was lying face down on the pavement. He had been shot in the buttocks and abdomen, and was declared dead at 12:58 a.m.

3

Security camera footage revealed that the shooter was in a black Volkswagen Jetta, which was determined to be Jordan Asberry's car. Asberry was a member of Heem. D.W.'s cellphone was recovered at the scene, which contained a video in which Asberry said, "[F]uck Tru," and "[F]uck Squad. You can catch my fade or catch hollows." A Sacramento police detective understood "catch my fade" to mean either "I'm going to kill you" or "I'm gonna beat you up," and he understood "catch hollow" to likely mean something to the effect of "catch bullets."

T.L. texted M.F. asking if she had seen D.W. that night. He texted M.F. screenshots of the Snapchat messages sent from M.F.'s account to D.W. M.F. had not sent those messages, and they had been deleted from her Snapchat account.

T.L. told the police after the shooting that his group of friends, including D.W., referred to themselves as Squad. He said that Squad did not get along with Heem.

II

*The Shooting of M.F.*

M.F. testified to the events surrounding her own shooting as follows: M.F. and Lewis had known each other for several years and had been romantically involved in the past. While they were involved, Lewis was nice to M.F., and she had cared for him. They stopped hanging out in February 2016, when Lewis got a new girlfriend.

On June 24, 2016, after learning of D.W.'s murder, M.F. contacted Jones and said she did not know he would use her Snapchat account to "fake Tru out" meaning D.W. Jones told M.F. to "play [her] role" and "keep [her] mouth shut" about the incident. He also told her to ignore anyone who contacted her about the incident and to get in touch with Lewis. M.F. complied; she called Lewis and told him that Jones had used her Snapchat account to send messages to D.W., and that Jones had instructed her to call Lewis. Lewis hung up the phone. M.F. called Lewis back, and he told her that he would come pick her up at her friend K. B.'s house.

4

Later that evening, Lewis, accompanied by Elijah Watts and two other males she did not know, picked up M.F. in his car. Lewis told M.F. they were going to a park to smoke marijuana. Lewis parked his car at a nearby park, and they all walked into the park. Lewis and M.F. walked together, apart from the others. As they walked, Lewis asked M.F. if she had deleted their text messages from earlier that day, and whether anyone knew she was with him. M.F. lied and said she had deleted their text messages and no one knew she was with Lewis, when she had in fact told her friend, K. B. she was with Lewis. Lewis, while sounding mad and irritated, also questioned why M.F. had let Jones use her Snapchat account.

Lewis and M.F. eventually started walking back towards the car, when Lewis said he had to urinate. M.F. turned away to give Lewis privacy. As soon as she turned, Lewis fired gunshots at M.F. Two bullets hit M.F. and she fell to the ground. She yelled, "What are you doing? Stop." Lewis fired several more shots, which did not hit M.F., and then he ran towards the car. Once he reached the car, Lewis fired a few more shots at M.F., but again did not hit her. M.F. ran and hid in the bushes and flagged down a passing car, which took her to the hospital. M.F. was treated for a gunshot wound on the left side of her back and a second gunshot wound on her left hip. A police officer contacted M.F. at the hospital. She initially told the officer that she did not know who shot her because she was scared that she was going to get hurt further. She eventually told the officer she was shot by Lewis, and that she was scared Lewis was going to kill her. After spending eight hours at the hospital, M.F. was discharged. She was on crutches for approximately two months, but eventually recovered from her injuries.

Lewis testified on his own behalf as follows: Lewis dated M.F. from 2015 to early 2016, and they remained in communication afterwards. Lewis did not know Jones that well in June 2016. Jones was friends with Lewis' close friend Watts, and although Lewis would sometimes see Jones while hanging out with mutual friends, Lewis "[n]ever really cared much for [Jones]." Lewis denied any involvement with D.W.'s murder, learning of

5

it through social media posts while eating at a restaurant with his friends Watts and Jerimiah Hankins.

On June 24, 2016, Lewis was with Watts and awoke to a phone conversation between Watts and Jones. Jones told Watts to tell Lewis to contact M.F. Lewis saw on his cellphone that M.F. had already texted him. Lewis called M.F., who said she needed his help and was in trouble. M.F. explained that she had given Jones her Snapchat login information, which Jones used to contact D.W. Lewis, suddenly realizing Jones was involved in D.W.'s murder, hung up on M.F. Lewis told Watts what M.F. had said, and Watts called Jones on speakerphone. Watts told Jones what M.F. had said, and Jones responded, "Yes, yes she has to go. Clearly, she has to go." Jones told Lewis he "had to pick [M.F.] up." Lewis believed Jones asked him to do so because M.F. trusted him. Lewis told Jones that M.F. could not stay at his house. So, Jones told Lewis to pick up M.F., and that he would come by later to pick M.F. up from Lewis' house.

At this point, Lewis realized M.F.'s life was in danger if he did not intervene. Rather than have Jones pick up M.F., Lewis had Watts call Jones back and tell him that Lewis would pick her up. Lewis thought that if he picked up M.F., he could make sure that she was not killed. Jones asked Lewis and Watts if they had a gun. Watts and Lewis said they did not, so Jones told Lewis and Watts to pick up a gun from Asberry's house.

Lewis smoked marijuana and snorted cocaine and then drove to Asberry's house with Watts, Hankins, and Daniel Carter, to pick up the gun. Lewis was "super familiar" with Hankins because he was Watts' brother. However, Lewis did not consider himself to be friends with Carter, as they had just met earlier that month. When they arrived, Asberry handed the gun to one of the people in the car and said, "Make sure–make sure this comes back with two bodies on it." Someone asked Asberry whether it was the same gun that had killed D.W., and Asberry indicated that it was. Someone then asked Asberry if Jones had killed D.W., and Asberry responded, "No. Clearly, I stamped Tru." Lewis did not believe he could report this to the police because he would have been

6

labeled a snitch and put himself and his family in danger, for the same reasons that M.F. was in danger.  Lewis also did not think the police would have believed him.

Lewis put Asberry's gun under his seat and drove around with Hankins, Watts, and Carter for the next hour or two, playing music and smoking marijuana.  As they drove around, Lewis felt afraid and worried about what might happen to M.F.  While he considered staying out of the situation, he believed that if he did, M.F. would be killed.  He also feared that if he told M.F. she was in danger, he would be labeled a snitch.  He felt he had no choice but to shoot and injure M.F. himself, though he did not want to do so.  Lewis picked up M.F. and drove her to a park in what he considered a nice part of Elk Grove, believing people were more likely to call the police if they heard gunshots.  Lewis testified that his plan was to shoot M.F. in the leg so that police could arrive at the scene quickly to help her.  He believed that if he did not shoot her in the head or the heart, she would not die.  However, Lewis did not consider himself a skilled marksman "whatsoever."

When they arrived at the park, Lewis and M.F. split off and walked together.  Lewis asked M.F. if she deleted her text messages with him because he did not want to get in trouble.  Lewis said he "had to pee," and M.F. turned around.  After he urinated, Lewis turned to M.F. and aimed low, hoping to strike her legs.  He fired the gun while her back was still turned from approximately nine feet away.  Lewis thought he only fired one shot at M.F., but later learned he shot her twice.  M.F. fell down and Lewis ran back to the car.  Carter and Hankins also ran towards the car; Watts was already at the car.  M.F. yelled, "Eddie, no stop."  Lewis' car-mates looked at Lewis, so Lewis fired three more shots in M.F.'s general direction to make it appear as though he meant to kill her, though he was not actually aiming at M.F.  Lewis saw M.F. crawl away.  The four males left in their car.  After thirty minutes or an hour later, Lewis returned to the park with Carter to ensure M.F. was not dead.  M.F. was no longer in the park, so they returned to Lewis' mother's house.

At the house, Lewis, Watts, Hankins, and Lewis' ex-girlfriend and her cousin spent the night drinking whisky, smoking marijuana, doing cocaine, and recording videos of themselves laughing and posing. Watts posed with the gun Lewis had used to shoot M.F., and Lewis posed, pretending to hold a gun.

Lewis testified that he was not a member of Heem, but that he was a member of a group called Reckless. Reckless was not known as a gang. Lewis also admitted that he was a member of East Side Piru (Piru), which is a validated criminal street gang. He was questioned about photographs of him holding guns and making gang hand signs. He also was asked about various text messages in which he referred to guns and shootings.

The jury saw a video of Lewis from one month before the crimes reciting rap lyrics from a Mozzy song, in which he said, "Murder gang, murder gang, murder gang . . . that's gonna be my new shit" and "Cause I promote violence!" They also viewed two sets of rap lyrics on Lewis' cellphone that Lewis wrote in the weeks before the crimes, which contained statements such as, "We at war [N-word] know ima soldier you see me front line," "Call me the grim reaper," "[L]ose my life over PIRU" and "Kill anybody over piru."

An Elk Grove police officer testified that the police recovered four spent nine-millimeter shell casings in the park where M.F. was shot. Sacramento police officers apprehended Lewis and his three passengers in a Lexus, finding a nine-millimeter semiautomatic pistol in the vehicle, which was determined to be the source of the casings found at the park.

### III

#### *Heem and Squad*

Deputy Sheriff Dexter Powe was a school resource officer for the Elk Grove Unified School District from 2005 to 2017, while also performing general patrol activities in the community. Powe was stationed at Sheldon High School. In 2013 or 2014, one of the vice-principals of Sheldon High School informed Powe of two rival

8

groups on campus, Heem and Squad. Heem and Squad were not validated criminal street gangs, but Powe believed they functioned as such, in that they were violent, challenged each other to fights, identified themselves with names, symbols, and phrases, caused disruptions on campus, and engaged in criminal activity. Powe was in constant communication with staff as to the groups' whereabouts during the day because they were always concerned there would be a conflict. Powe documented incidents between the two groups from August 2014 to 2017. He testified to the following incidents.

On September 4, 2014, there was a physical fight on campus between multiple individuals who belonged to either Heem or Squad, including D.W.

On September 11, 2014, students yelled, "Heem" on campus and displayed hand signs in reference to Heem.

On September 16, 2014, a student associated with Heem got into an argument on campus with another student who was associated with Squad, and at some point, the two fought physically at a park. On September 17, a student associated with Heem and a student associated with Squad fought on campus.

On October 7, 2014, a student associated with Squad produced a hammer during an altercation on campus, but the school administration intervened before anything physical occurred. The following day, Watts (a member of Heem) and another individual—neither of whom were students at Sheldon High School—were observed on campus without approval, causing a "huge disturbance." After Watts and the other individual left the campus, Deputy Powe received a report of a fight taking place at a nearby park. When Powe drove by the park, he observed a large group of people gathered at the park, including Watts and several members of Heem and Squad.

Two days later, Deputy Powe heard a report of a physical fight at another park near the campus. A large group was gathered at the park. Jones was with his brother

Daniel[2] at the park, where Jones brandished a weapon and challenged a Squad member's brother, Curtis Foster, to a fight. Foster refused. Eventually, Daniel and Foster's friend Darius Simpson fought each other at the park, but without weapons. Later that evening, officers went to Jones' home and found Daniel's gun hidden behind a mattress in Jones' bedroom, which Jones admitted to carrying at the park earlier that day. The officers also found Simpson's wallet and identification in Daniel's bedroom.

On October 10, 2014, Deputy Powe arrested Watts and another non-student for violating the stay-away order by coming to a football game on campus.

On November 5, 2014, students associated with Heem and Squad got into an argument yelling, "guns up" and "guns down." One week later, Jones' other brother D.J., who was associated with Heem, yelled, "Squad K" meaning "Squad killer" on campus. On November 20, 2014, D.J. and a student identified to be in Squad got into a physical fight on campus. The next day, two students associated with Heem challenged Foster to a fight, referencing "Squad K." And on December 19, 2014, two former students associated with Heem were on campus and yelled, "[F]uck Squad" as they fled.

In August 2015, Jones' brother and another student separately yelled, "Heem" on campus. On August 20, 2015, Deputy Powe responded to a student's selfie on social media, in which he held a firearm with the profile "fuck Heem" and Sheldon High School in the background. The student said members of Heem had threatened to shoot him, so he wanted to show he also had a firearm. In November 2015, there was a physical altercation across the street from the high school between individuals associated with Squad and Heem.

Deputy Powe testified that Lewis did not attend Sheldon High School between 2014 and 2016 and was not involved in any of the aforementioned incidents involving

---

[2] We refer to Jones' brothers by their first name or initials to avoid confusion and mean no disrespect.

Heem and Squad. Deputy Powe had seen Lewis in the presence of Heem members on a number of occasions, but could not recall any particular incident between Heem and Squad that involved Lewis.

IV

*Procedural History*

Defendants were tried jointly before a single jury. The jury found Jones guilty of conspiracy to commit the murder of D.W. (Pen. Code, § 182, subd. (a)(1)) first degree murder of D.W. (Pen. Code, § 187, subd. (a)(1)), and conspiracy to commit the murder of M.F. The jury found Lewis guilty of conspiracy to murder M.F. (Pen. Code, § 182, subd. (a)(1)) and the attempted murder of M.F. (Pen. Code, §§ 664/187, subd. (a)). It further found true that Jones was armed with a firearm when he murdered D.W. (Pen. Code, § 12022, subd. (a)(1)), that both Jones and Lewis were armed with firearms when they conspired to murder M.F., and that Lewis intentionally and personally discharged a firearm, thereby proximately causing great bodily injury to the victim (Pen. Code, § 12022.53, subds. (b)-(d)).

The trial court denied Lewis' request for probation and sentenced him to an indeterminate term of 32 years to life in state prison, comprised of seven years to life for attempted murder, plus a consecutive term of 25 years to life for the firearm enhancement. On the conspiracy count, the trial court imposed and stayed, pursuant to Penal Code section 654, a term of 25 years to life plus one year for the firearm enhancement.

The trial court also denied Jones' request for probation and sentenced him to an aggregate state prison term of 50 years to life, plus two years. Jones' sentence was comprised of 25 years to life for murder, plus one year for the firearm enhancement, and a consecutive term of 25 years to life for conspiracy to murder M.F., plus one year for the second firearm enhancement. On the count for conspiracy to murder D.W., the court imposed and stayed, pursuant to Penal Code section 654, a term of 25 years to life.

11

DISCUSSION

I

*Motion to Sever*

Lewis first argues that the trial court abused its discretion by declining to sever Lewis' trial from Jones' trial, or alternatively, to use a separate jury for each defendant. Lewis contends that he was greatly prejudiced by the evidence of D.W.'s brutal murder and the related feuding between Heem and Squad, and by Jones' attorney's efforts to discredit Lewis to bolster Jones' own defense. We find no abuse of discretion.

A. *Applicable Legal Standard*

Penal Code section 1098 authorizes the joint trial of two or more defendants, stating that "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must be tried jointly*, unless the court order separate trials." (Italics added.) "This law thus establishes a legislative preference for joint trials, subject to a trial court's broad discretion to order severance." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*).) When "defendants are charged with having committed 'common crimes involving common events and victims,'. . . the court is presented with a ' "classic case" ' for a joint trial. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.)

Our Supreme Court has articulated the "guiding principles a trial court should follow when exercising [its] discretion: ' "The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " ' [Citation]." (*Thompson, supra*, 1 Cal.5th at p. 1079.) An abuse of discretion may therefore arise where (1) the evidence of the crimes would not be cross-admissible in separate trials; (2) some of the charges are unusually likely to inflame the jury against the defendant; (3) a weak case has been joined with a strong case or another

12

weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; or (4) in certain death penalty cases. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.) However, when deciding whether to sever, "[l]ess drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 100.)

"A trial court's ruling on a severance motion is reviewed for abuse of discretion on the basis of the facts known to the court at the time of the ruling." (*People v. Box* (2000) 23 Cal.4th 1153, 1195, disapproved on other grounds by *People v. Martinez* (2010) 47 Cal.4th 911.)

### B. Additional Procedural Background

Lewis moved to sever his trial from Jones' trial, or alternatively, to use dual juries for the codefendants. Lewis argued that the " 'quasi-gang' " evidence regarding Heem and Squad was inflammatory, irrelevant as to Lewis, and would subject Lewis to guilt by association. The trial court issued a written ruling, finding that the evidence related to Heem and Squad was not so prejudicial that Lewis would be found guilty purely because of his connection to Jones, a Heem member. It noted that multiple exhibits show "plenty of interaction on a frequent basis" with Lewis and Jones and others in Heem, including evidence that Lewis drove to Asberry's house with Heem members to obtain a gun at Jones' direction to shoot M.F.[3] The trial court stated that the " 'gang' " evidence was "crucial and inseparable" from whom Lewis chose to associate with in the weeks and hours prior to the shooting, and there was much evidence for the jury to consider beyond

---

[3] We note that none of the parties point to any evidence in the record, nor could we find anything on our own review, showing that Hankins or Carter, the other two alleged coconspirators who picked up the gun and M.F. with Lewis, were Heem members. The trial court's rulings here and elsewhere reflect its assumption that Carter and Hankins were in Heem, and although this is perhaps true, it does not appear to be supported by the evidence presented to the jury.

the gang evidence. The evidence also provided context for Lewis shooting M.F., and it was therefore highly likely that evidence of the Heem/Squad rivalry would be admitted even if Lewis had a separate trial. The trial court concluded that a limiting instruction, such as one stating that Deputy Powe does not have an opinion that Lewis is a member of Heem, is sufficient to cure prejudice. Lewis' motion for separate juries was denied on the same basis.

### C. Analysis

The trial court's ruling was not an abuse of discretion. We start from the proposition that a separate trial for a defendant in a jointly charged case is "not a matter of right but rather a privilege." (*People v. Wallace* (1970) 13 Cal.App.3d 608, 616.) Lewis does not assert a compelling basis for the privilege of a separate trial.

Here, while Lewis argues that the trial court should have granted the motion to ensure that evidence of (1) D.W.'s murder and (2) the Squad/Heem rivalry did not taint Lewis' trial, we disagree. First, evidence of the circumstances surrounding D.W.'s murder would have likely been admitted had Lewis been tried separately, as the crimes in this case were inextricably intertwined. "A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citation]." (*People v. Marshall* (1997) 15 Cal.4th 1, 28.) In this case, Jones used M.F.'s Snapchat login information to lure D.W. outside so Asberry could shoot him. When M.F. told Jones she knew he had used her account to murder D.W., Jones told Lewis that M.F. "had to go." D.W.'s murder was therefore the impetus for M.F.'s shooting, as Jones sought to cover up his (and fellow Heem member Asberry's) involvement in D.W.'s murder by silencing M.F. for good. And to do so, Asberry gave Lewis the same gun used to kill D.W. Thus, given the factual entanglements between the D.W. murder and the attempted murder of M.F., such evidence would have almost certainly been admitted regardless of Jones, and Lewis was therefore not unduly prejudiced by the jury hearing evidence of D.W.'s murder as part of Jones' case.

14

Nonetheless, Lewis argues that a jury would view D.W.'s murder as far more egregious and emotionally charged, unjustly inflaming the jury, given that the jury viewed the video of D.W.'s shooting and attempt to crawl to safety. We disagree. First, there was no suggestion at trial that Lewis had any involvement in D.W.'s murder, and the jury would have no reason to convict Lewis based on its findings on D.W.'s murder. Further, although the jury viewed footage of D.W.'s murder, the videos were short, had no sound, were filmed from a distance at night, and did not show any blood or injuries. We are not convinced that this evidence of D.W.'s murder would have unfairly turned the jury against Lewis, when they also heard testimony that Lewis lured M.F. to the park, shot her at close range, and fled, leaving her to drag herself, injured and bleeding, to safety. The violent and distressing nature of both crimes was therefore comparable.

Further, along with evidence of D.W.'s murder, evidence of the Heem/Squad rivalry would almost certainly have been presented to the jury regardless of severance or separate juries. The nature of Squad and Heem, and the animosity between the two groups, drove the entire series of events leading to D.W.'s murder and M.F.'s attempted murder. Jones sought to murder D.W. because of the gang feud. The People then argued that Lewis sought to murder M.F. to help Heem members Jones and Asberry cover their tracks, because he was a "gangster" or a "wannabe gangster" who wanted "street cred." Had the trial court excised all references to Squad and Heem from the evidence, the jury would have been at best confused, and at worst deceived as to Lewis' possible motivations. Indeed, the prosecution would have been unable to present any intelligible theory of what motivated the crimes.

Moreover, the risk of prejudice to Lewis from the evidence of the Heem/Squad feud was fairly minimal. Deputy Powe testified that Lewis did not attend Sheldon High School between 2014 and 2016 and was not involved in any of the specific incidents involving Heem and Squad that Powe had described to the jury. Powe further testified that he could not recall any particular Heem-related incident involving Lewis. Lewis also

15

testified that he was not in Heem.  The jury instructions reflected this, stating that the People "presented evidence about [ ] Jones' alleged association with Heem," and instructing the jury how to use this evidence.  It did not reference any alleged association between Lewis and Heem.  The jury was therefore well apprised of the lack of direct evidence showing that Lewis was a member of Heem.  As evidence of the Heem/Squad rivalry would have regardless been included at Lewis' trial, and it was not unduly prejudicial in the manner presented, the trial court did not err in denying severance (or separate juries) on this basis.

Finally, regardless of whether the issue was forfeited for failure to raise it in the trial court,  Lewis' argument that the trial court should have granted the motion in view of Lewis and Jones' conflicting defenses fails on the merits.  As stated, we review the trial court's decision based on the information available at the time of the ruling.  Lewis points to nothing in the record indicating that Lewis' and Jones' defenses were expected to be incompatible or that Jones' defense would unjustly harm Lewis' case.  Moreover, " ' " 'to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.' " (*Thompson, supra*, 1 Cal.5th at p. 1081.)  Lewis has failed to show that Lewis' defense was so irreconcilable with Jones' defense that the conflict would have necessarily and unfairly persuaded the jury that both defendants were guilty.  Simply insinuating Lewis may have been involved with D.W.'s murder, and cross-examining Lewis on his credibility and treatment of M.F., does not create two irreconcilable defenses requiring severance.

Based on the foregoing, we find no abuse of discretion.

16

II

*Evidence of Lewis' Gang-like Activities and Associations, Rap Lyrics, and Guns*

Lewis next contends that a variety of evidence admitted at trial amounted to impermissible character evidence, which, individually or cumulatively, necessitates a new trial. While we conclude that evidence of the Heem/Squad rivalry was admissible, we agree with Lewis that the trial court abused its discretion by admitting a variety of other evidence, and that the error was not harmless. On these grounds, we reverse.

A. *Applicable Legal Principles*

Evidence Code section 352[4] imbues the court with discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[A]s [a] general rule, [gang evidence] is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).) It also is admissible when relevant to prove identity or motive. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) However, "[e]ven where gang membership is relevant, because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it. [Citation]." (*People v. Williams* (1997) 16 Cal.4th 153, 193.)

Section 1101, subdivision (a), prohibits the admission of character evidence "to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) Subdivision (b) of section 1101 then "clarifies the scope of subdivision (a)." (*People v. Guzman* (2019) 8 Cal.5th 673, 689.) It provides that character evidence is admissible "when relevant for

---

**4**      Undesignated statutory references are to the Evidence Code.

17

a noncharacter purpose–that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident.' " (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238, citing § 1101, subd. (b).) " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

### B. Evidence of the Squad/Heem Rivalry

#### 1. Procedural Background

Prior to trial, Deputy Powe testified at a section 402[5] hearing regarding the admissibility of Squad and Heem's gang-like activities. Powe described the numerous violent or threatening incidents between Squad and Heem members, and the indicia that they functioned like gangs, such as violence, guns, writing "Heem" or "Squad" on notebooks and backpacks, and an "H" belt buckle. Powe confirmed that he had no information implicating Lewis as a member of Heem or as a participant in any of the incidents between Squad and Heem. However, Powe said he had seen Lewis with members of Heem at various times.

After the hearing, the trial court issued a lengthy written ruling, finding that Deputy Powe's testimony regarding the Squad/Heem rivalry was relevant as to Jones' motive and mental state, and was not unduly prejudicial. With respect to Lewis, the trial court observed that the prosecution would not use Powe's testimony to establish Lewis as

---

[5] Section 402 creates a mechanism for the trial court to make preliminary findings of fact to determine the admissibility of evidence prior to trial.

a member of Heem. Nonetheless, it found Lewis' involvement with known Heem members leading up to and during his crimes, relevant and not unduly prejudicial. It reasoned that although "the Heem vs. Squad rivalry was not necessarily in play during the [M.F.] shooting" because M.F. was not a member of Squad, M.F.'s shooting was still "factually interwoven" with the evidence of D.W.'s murder. It concluded that evidence of Lewis' "involvement with other people who happened to be active in that group cannot be extricated by legal artifice without misleading the jury."

    *2. Analysis*

The trial court acted within the bounds of its discretion by finding evidence of the Squad/Heem rivalry admissible at trial. As discussed *ante*, the nature of Squad and Heem, and the animosity between the two groups, drove the entire series of events leading to D.W.'s murder and M.F.'s attempted murder. Further, this is a case with multiple conspiracy charges, including a charge against Lewis for conspiracy to murder M.F. To prove this, the prosecution had to convince the jury that Lewis, along with Jones, Watts, Asberry, Hankins, or Carter, had an agreement and harbored the intent to kill M.F. The agreement and intent to murder M.F. flowed directly from Jones' (and at least one other Heem member's) involvement in D.W.'s murder—again, a crime motivated only by the Heem/Squad feud. Lewis' participation in the conspiracy, which was formed to help Heem members cover up evidence of their connection to D.W.'s murder, cannot be explained without reference to Heem and Squad.

Additionally, no undue prejudice resulted from the jury hearing evidence of Squad and Heem. As we have observed, the jury heard that none of the Heem/Squad incidents involved Lewis, and the jury was instructed to consider only Jones' alleged association with Heem. Thus, the jury was able to appropriately weigh this evidence against the evidence that Lewis associated with Heem members and shot M.F. in connection to crimes fueled by animosity between Heem and Squad, and draw its own conclusions about Lewis' possible motivations. And, there is little risk the jury would convict Lewis

19

based on his association with Heem members, given his lack of direct connection to Heem, and the violent nature of his own crimes as compared to the smaller scuffles between Heem and Squad that Deputy Powe described. Accordingly, admitting Powe's testimony regarding Heem and Squad was not an abuse of discretion.

### 3. Evidence from Lewis' Cellphones and Evidence of Lewis' Gang Associations

We reach a different conclusion when considering the admissibility of a variety of evidence from Lewis' cellphone and evidence of Lewis' affiliations with Reckless and Piru. As we explain, the trial court abused its discretion by allowing in irrelevant and inflammatory evidence, irretrievably and impermissibly prejudicing the jury against Lewis.

### i. Additional Procedural History

### 1. The Trial Court's Rulings

Before the trial, the trial court issued a variety of rulings regarding "gang-related evidence" extracted from Lewis' cellphones.

It first found a video taken approximately three weeks before the crimes to be probative of motive and intent and not unduly prejudicial. In the video, Lewis said, "Cause I promote violence!" and "Murder gang, murder gang, murder gang . . . that's gonna be my new shit." The trial court found the video "tends to show he was motivated to function in concert with the alleged coconspirators with violent intention." Thus, the court found Lewis' "generic promotion of violence" probative of his intent and motive when he shot M.F., and that it was not unduly prejudicial.

Thereafter, Lewis' counsel filed two supplemental briefs, again objecting to the video, and also objecting to other gang-related rap lyrics and statements extracted from Lewis' cellphone, as inadmissible character evidence under section 1101, subdivision (b). One set of lyrics, written on Lewis' cellphone on June 7, 2016, said: "We at war [N-word] know ima soldier you see me front line We can knock in the middle of the field like a drumline That's gunfire lil [N-word] residue on the outline of the canvas When you

20

see me betta squeez ckuz i aint givin no passes [N-word] speakin on boloma and that's on my dead brotha i can't have it Call me the grim reaper."

Another set of lyrics, written on June 12, 2016, said: "All my [N-word] bangin PIRU If my [N-word] shoot than i shoot These [N-word] is soft like hi chews Was bangin smackcity through highschool Ask where im from i say piru lose my life over PIRU Heavy metal no light tools Kill anybody over piru."

The trial court ruled that in view of Lewis' defense that he lacked the intent to kill M.F., evidence of statements showing his general involvement in gangs was relevant to show that he was motivated to kill M.F. because he was willing to follow the orders of a gang. It specifically cited Lewis' lyrics stating that he was "a soldier" and "at war" as probative to show that Lewis was acting in response to orders. The trial court further found the lyrics probative due to the closeness in time to M.F.'s shooting. While it did not find the evidence would be unduly prejudicial, it stated that the evidence was admissible only with a limiting instruction.

The trial court initially excluded photographs of Lewis holding guns, or in the company of others holding guns. However, while cross-examining M.F., Lewis' counsel asked M.F. if she had expected Lewis to shoot her. M.F. said no. Counsel asked, "Because [Lewis] had never been abusive to you, correct?" M.F. agreed. Lewis' counsel then asked, "And you'd never seen him be aggressive toward other people, correct?" M.F. said that was correct.

At the break, Jones' counsel argued that asking M.F. about Lewis' aggressive behavior opened the door to questioning M.F. (and her friend) about Lewis' prior gun use or possession. Lewis' counsel objected based on relevance and prejudice, and argued that holding a firearm does not equate to aggressiveness. Relying on section 1102, the trial court ruled that evidence of Lewis with a gun could be presented as rebuttal evidence. It reasoned that "a teenager with a gun is demonstratively aggressive," and the

21

parties would give the jury a limiting instruction, thereby curtailing potential prejudice and confusion.

Finally, at some point during Lewis' testimony, Lewis' attorney objected in a sidebar to references to Piru and the admission of Exhibit 125, which contained the photographs of Lewis with guns and in a Reckless shirt, and Lewis' text messages regarding shooting guns. He eventually put this objection on the record, stating that he had objected to Exhibit 125, "for both the pictures with the guns and the information about East Side Piru," and the Reckless association.

### 2. *Trial Testimony*

At trial, the prosecutor and Jones' counsel questioned Lewis about his associations with Reckless and Piru. Lewis said he was a member of Reckless, but that Reckless was not a gang. The prosecutor showed pictures from May 24, 2016, of Lewis holding an assault rifle and wearing a shirt that said, "Been Reckless." She played a June 2, 2016, video from Lewis' cellphone, in which Lewis was riding in a car with his friends and said, "Man, Reckless Gang in this motha fucker, you feel me? Little broke-back ho, they finna shoot a [N-word]. Seventeen. Here's here, [N-word]." Lewis also said, "Gang, [N-word]."At one point, Jones' attorney asked Lewis whether Reckless "[got] along with" Squad. Lewis said that Reckless did get along with Squad, "even though [Reckless] had no association with them." He further said that Watts was the only member of Reckless who did not get along with Squad, but that was due to Watts' association with Jones and others in Heem.

The attorneys also asked Lewis multiple times about his membership in Piru. Lewis confirmed that he previously associated with Piru, a validated criminal street gang. The prosecutor showed several pictures of Lewis making a Piru gang hand sign. While discussing Lewis' membership in Piru, the prosecutor had Lewis read aloud his rap lyrics stating, "All my [N-word] bangin' Piru. If my [N-word] shoot, then I shoot . . . Lose my life over Piru. . . . . Kill anybody over Piru."

22

The jury also viewed the video of Lewis saying, "Murder gang, murder gang, murder gang . . . that's gonna be my new shit" and "Cause I promote violence!" Lewis explained that those statements were rap lyrics from the Mozzy song, "Murda Gang," and had nothing to do with his charged crimes. The prosecutor asked, "When you shot [M.F.], you had violent intentions, isn't that true?" Lewis answered, "I can't say that's true." The prosecutor said, "Less than a month before you shot her, you recorded yourself yelling, 'I promote violence,' right? We saw that video." Lewis said that he was "[n]ot saying anything of that matter due to [M.F.] or this case," because "a month ago I did not have any idea that any of this was going on. That video was a SnapChat video that me and my friends were making." The prosecutor responded, "So are you saying you're not a violent guy, you're not promoting violence? . . . Were you promoting violence at this time of your life, summer of 2016?" Lewis answered, "No, I was not."

The prosecutor also asked Lewis about text message exchanges in which Lewis mentioned guns and shootings, which were found in the same exhibit as the pictures of Lewis holding guns and making gang hand signs. On May 21, 2016, Lewis sent a text message saying, "I just got in a shootout." In a June 20, 2016, text message, Lewis wrote, "Ckuz I took his guns but lil brah didn't know what he was doing with them mfs frfr [*sic*] the streets aint for everybody especially when it comes to gunplay so i had to confiscate his yeekies [*sic*]." Lewis also sent a text message a few days later stating that his car had been shot up two weeks prior. On June 21, 2016, Lewis wrote the message, "even if he knew where i lived he wouldnt pull up i will smoke that [N-word]." On June 24, 2016, Lewis sent a text message with a gun emoji and said, "I keep it on me" and "Im never lackin lol." The attorneys also elicited testimony from M.F. and her friend, K. B., confirming that they had seen Lewis with a gun in the past.

ii.     *Analysis*

Lewis contends that all the aforementioned evidence—specifically his gang affiliations, rap lyrics, photographs, and text messages—was inadmissible character

23

evidence under section 1101, subdivision (a). He argues that the cumulative effect was so prejudicial that it violated Lewis' federal due process rights and rendered his trial fundamentally unfair. We address each category of evidence in turn.

### 1. *Reckless and Piru*

First, we have no hesitation in concluding that the trial court abused its discretion by permitting questioning and admitting evidence of Lewis' affiliations with Reckless and Piru. Courts have long recognized the highly inflammatory impact of gang evidence. (*People v. Maestas* (1993) 20 Cal.App.4th 1482, 1497-1498.) Due to its uniquely prejudicial nature, "the California Supreme Court has condemned the introduction of such evidence if it is only *tangentially* relevant to the charged offenses. [Citation.] In fact, in cases not involving gang enhancements, the Supreme Court has held evidence of gang membership should not be admitted if its probative value is minimal. [Citation.] 'Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.' [Citation.]" (*Albarran, supra*, 149 Cal.App.4th at p. 223.)

Here, Lewis' affiliations with Reckless and Piru are simply irrelevant to the theories and defenses driving the case. The People argued that Lewis tried to murder M.F. to get "some street cred" with Jones and the other Heem members, as a "gangster" or "wannabe gangster." In his defense, Lewis asserted that he sought to nonfatally injure M.F. to save her from Jones' efforts to murder her. There was no evidence presented, or even any suggestion, that Reckless or Piru were involved in these crimes, either directly or indirectly.

Nonetheless, the trial court found the evidence admissible for purposes of Lewis' motive and intent, and specifically to rebut Lewis' defense that he did not intend to murder M.F. when he shot her. We cannot draw that connection. None of the parties argued that Lewis shot M.F. because he was motivated by Reckless or Piru in any way.

24

In fact, Lewis testified that Reckless and Squad had no association with one another, and to the extent they did, the groups generally got along. Without any evidence or argument that Lewis's criminal acts were motivated by Reckless or Piru, there is no basis for their admission as evidence of motive or intent. (*Albarran, supra*, 149 Cal.App.4th at p. 227 [abuse of discretion to admit gang evidence where there is no evidence of gang motive].) This is particularly so here, where the court must view gang-related evidence with additional skepticism, given that the People did not charge Lewis or Jones with gang enhancements.

Further, the exhibits and testimony demonstrating Lewis' connection to the gangs were also highly inflammatory and confusing to the jury. Here, the jury saw pictures of Lewis flashing gang hand signs. Videos showed him saying, "Man, Reckless Gang in this motha fucker . . . they finna shot a [N-word]," and "Gang, [N-word]." Lewis's rap lyrics said, "All my [N-word] bangin' Piru. If my [N-word] shoot, then I shoot . . . Lose my life over Piru . . . . Kill anybody over Piru." Lewis was repeatedly questioned about his affiliations with both groups, raising and re-raising the connection between Lewis' gangster persona and gang activity to the jury, all of which were certain to evoke emotional bias.

Further, the prosecution's "wannabe gangster" theory seemed to rely largely on the jury unfairly conflating Lewis' involvement with Piru and Reckless and his willingness to kill for Piru with a willingness to kill for Heem. The evidence allowed the prosecutor and Jones' attorney to argue at closing that Lewis was a "gangster" or "wannabe gangster," living a "gangster lifestyle," without actually connecting Lewis to the gang at issue. In other words, the gang evidence created the risk of unfair conflation and juror confusion, as it was used to broadly imply that Lewis was of bad character, a violent gangster who was predisposed to commit crimes. "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged

25

offense.  [Citation.]"  (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)  Here, the sole relevance of the gang evidence was as an impermissible character or disposition evidence.

The trial court therefore abused its discretion by permitting this evidence.

### 2.  *Rap Lyrics*

We further find erroneous the admission of rap lyrics in their various iterations. First, we fail to see the relevance of Lewis' video in which he says lyrics from the rap song "Murda Gang" one month before shooting M.F.  Again, this video amounted to impermissible, and prejudicial, character evidence.  When ruling on the video's admissibility, the trial court took the lyrics literally, finding they were relevant to Lewis' motive and intent when he shot M.F. because the lyrics "tends to show he was motivated to function in concert with the alleged co-conspirators with a violent intention." However, musical lyrics are " 'figurative expressions' " that " 'are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory.' "  (*In re George T.* (2004) 33 Cal.4th 620, 636-637.)  There is no indication that these lyrics bore any relationship to actual events, or to Lewis' state of mind.  (See *People v. Melendez* (2016) 2 Cal.5th 1, 24 [handwritten rap song inadmissible where ". . . it appears the words were merely rap lyrics.  No reason appears to assume they relate actual events"].)  Their scant relevance is further diminished by the month-long gap between the recording and the shootings.  (Cf. *People v. Coneal* (2019) 41 Cal.App.5th 951, 969 [lyrics written close in time to a crime have higher probative value].)  Moreover, the prosecutor increased the risk that the jury would use these lyrics impermissibly.  When cross-examining Lewis, the prosecutor suggested the jury view the lyrics literally, drawing a straight line between M.F.'s shooting and the rap lyrics by insisting Lewis had "violent intentions" when he shot M.F. because, according to the rap lyrics, he was "a violent guy" who was "promoting violence" that summer.  Thus, the video served solely as inflammatory character evidence, with no relevance to the case.

26

The trial court similarly abused its discretion by admitting Lewis' June 7, 2016, and June 12, 2016, rap lyrics from his cellphone. While lyrics may be probative if they are written closely in time to the charged crime and are sufficiently similar to the crime (*People v. Coneal, supra,* 41 Cal.App.5th at p. 969), Lewis' lyrics bear virtually no relationship to his charges. The June 7, lyrics contain statements vaguely alluding to a violent "war," such as: "We at war [N-word] know ima soldier you see me front line," "When you see me betta squeez ckuz i aint givin no passes [N-word]" and "Call me the grim reaper." Even if we read these lyrics literally, which we hesitate to do, they state only that Lewis is a soldier, willing to kill or die for some undefined person or group. There is no reference to Heem or Squad, the groups driving the crimes in this case. And, as the parties seemed to agree that the evidence showed only that Jones, and not Lewis, was in Heem, there was no basis to think that the lyrics obliquely referenced Heem. Similarly, and as mentioned *ante*, Lewis' lyrics in the June 12, rap stating, "[L]ose my life over PIRU" and "Kill anybody over piru," may suggest—again *if* taken literally— that Lewis was willing to kill *for Piru*. But Piru is not at issue in this case. Thus, we see no connection between Lewis' intent and motive, and the lyrics.

Lewis' rap lyrics were also highly prejudicial for the reasons discussed. While the prosecution's theory was that Lewis was motivated to kill M.F. for "street cred," because he was a "gangster," these lyrics, without a connection to the crimes, simply encouraged the jury to view Lewis as a violent criminal. " 'The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory of relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 373.) While there may be some veracity to the way the People characterized Lewis, the lyrics here served solely to give the jury the impression that Lewis was a heartless gangster, in a case where there was no evidence

27

Lewis was in the gangs at issue, and no gang enhancements were charged.**6** We therefore must conclude that the trial court abused its discretion by admitting this evidence.

### 3. *Gun Evidence*

Finally, we find that the trial court exceeded its discretion by permitting multiple pieces of gun-related evidence as rebuttal evidence under section 1102. We note that the People do not substantively address this argument in their responsive brief. Rather, they generally argue with respect to the photographs of Lewis posing with firearms and "much of the character evidence," that the prosecution was "entitled to cross-examine Lewis on his affiliation with various gangs once he put his character [at] issue by testifying on his own behalf." The law does not support such a broad view of admissibility under section 1102.

Section 1102 creates an exception to the rule set forth in section 1101 prohibiting the admission of character evidence in criminal cases. (*People v. Felix* (1999) 70 Cal.App.4th 426, 429-430 (*Felix*).) It permits "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" when it is: "(a) [o]ffered by the defendant to prove his conduct in conformity with such character or trait of character" or "(b) [o]ffered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (§ 1102, subds. (a)-(b).) While section 1102 expressly authorizes opinion or reputation evidence in rebuttal, it does not authorize the admission of "specific instances of conduct." (*Felix, supra*, 70 Cal.App.4th at pp. 431-432.)

---

**6**    Lewis submitted a supplemental brief arguing that the admission of rap lyrics without compliance with the newly enacted section 352.2 prejudiced Lewis and requires remand for a new trial. Section 352.2 provides additional specified considerations that the trial court must balance before admitting evidence in the form of creative expression. However, Lewis'argument requires that we find the Legislature intended that section 352.2 apply retroactively to all nonfinal cases. For the reasons explained in *People v. Slaton* (2023) 95 Cal.App.5th 363, we conclude that section 352.2 is not retroactive, and thus has no application here.

28

Here, relying on section 1102, the trial court found that M.F.'s affirmative response to Lewis' counsel's question, "And you'd never seen him be aggressive toward other people, correct?" gave the other parties the ability to present rebuttal evidence of Lewis holding or possessing firearms. While the trial court's initial ruling made it sound as though the attorneys could simply question M.F. and her friend as to whether they had ever seen Lewis with a firearm, the ruling ultimately was not construed so narrowly. In fact, through its ruling, the trial court appears to have opened the door to irrelevant and prejudicial evidence, grossly disproportionate to M.F.'s testimony, and interwoven with evidence of Lewis' gang affiliations.

As an initial matter, we question whether evidence that a person possessed a firearm constitutes evidence that the person is aggressive. Lewis was 19 years old at the time of the relevant events, and there was no evidence presented that his firearm possession was illegal. Nor did the photographs reflect that Lewis threatened anyone with a gun or shot at anyone with a gun. Rather, the photographs admitted as rebuttal evidence included six pictures of Lewis holding a handgun and making a gang hand sign for Piru, and three pictures of Lewis holding an assault rifle in a "Been Reckless" shirt. These pictures did not provide general reputation or opinion evidence of Lewis' aggressiveness, which is what section 1102 permits. Instead, the photographs of Lewis with firearms showed him posing like a stereotypical gangster (for gangs not at issue in this case) in a way certain to evoke emotional bias in the jury, without providing any actual evidence of aggressiveness beyond posturing.

Next, the record regarding the basis for admitting the text messages about guns and shooting is not clear. The parties do not cite to any specific portion of the record where the trial court addresses the admissibility of the text messages, nor have we found any such reference in our own review of the record. However, from the record we have discerned the following: Lewis' counsel first makes a "standing objection" during testimony of the extraction data, which includes those text messages. This occurs after

29

M.F. has testified and the trial court has agreed to permit rebuttal evidence of aggressiveness. The prosecutor then uses the text messages to cross-examine Lewis, in connection with the photographs of Lewis with guns and making gang hand signs. These text messages and photographs together comprise Exhibit 125. After Lewis' testimony, his attorney put his prior sidebar objection on the record, stating that Exhibit 125 came in over his objection "for both the pictures with the guns and the information about East Side Piru."

A fair reading of this record reflects that the trial court permitted the text messages as further rebuttal evidence regarding whether Lewis was aggressive. As such, Lewis' text messages that he "just got in a shootout" and that he "had to confiscate" someone's guns are inadmissible on their face, as section 1102 does not authorize the admission of specific instances of conduct. (*Felix, supra*, 70 Cal.App.4th at pp. 431-432.) Lewis' text message stating that his car had been "shot up" is similarly inadmissible under section 1102, and also irrelevant, as being a victim of a shooting is not evidence of aggressiveness. Lewis' text message that he keeps a gun on his person, and is "never lackin," again is reflective of possible gun possession only. It is not opinion or reputation evidence of Lewis' aggressiveness. The trial court therefore erred in admitting these text messages under section 1102. However, we note that Lewis' text message, "even if he knew where i lived, he wouldnt pull up i will smoke that [N-word]," could be admissible under section 1102 to show aggressiveness, though it may also simply be evidence of Lewis' bravado. Regardless, the bulk of the text messages were plainly inadmissible under section 1102.

Moreover, even if the trial court permitted the text messages as evidence of intent or motive under section 1101, subdivision (b), rather than rebuttal evidence, this also was an abuse of discretion. The text messages do not relate to Heem or Squad, nor do they involve M.F., Jones, or any relevant individuals or facts in this case. They do not suggest a motive for Lewis' crimes, nor do they shed light on whether he intended to kill M.F.

30

Again, they simply serve as prejudicial character evidence, painting Lewis as a gun-wielding gangster.  The trial court therefore erred in admitting these messages.

### 4. *Harmless Error*

Lewis argues that the admission of the above-referenced evidence violated his federal due process rights, resulting in a trial that was fundamentally unfair.  He contends that we must therefore assess the erroneous admission under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24, and conclude that the erroneous admission of evidence was not harmless beyond a reasonable doubt.  The People counter that we should consider whether the error was harmless under the "reasonable probability" standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), but in any event, the error was harmless under either standard.  We conclude that regardless of which standard we apply, the error was not harmless, necessitating the reversal of Lewis' convictions.

Absent fundamental unfairness, an error in admitting evidence is an error of state law subject to the *Watson* test.  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  However, where the erroneous admission of evidence makes the trial fundamentally unfair, this is a violation of due process.  (*Ibid.*)  " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.'  [Citation.]" (*Albarran, supra*, 149 Cal.App.4th at p. 229.)

We need not decide whether this case is a "rare and unusual occasion[ ]" (*Albarran, supra*, 149 Cal.App.4th at p. 232) in which the admission of evidence has violated federal due process, as even under *Watson*'s standard, the errors are not harmless.  As we explain, "it is reasonably probable that a result more favorable to the

31

[defendant] would have been reached in the absence of the error[s]." (*Watson, supra*, 46 Cal.2d at p. 836.)

The crucial question for the jury to decide in Lewis' case was whether he harbored the intent to kill M.F. Here, the People did not present direct evidence of Lewis' intent or motive. As a result, Lewis' credibility was central to the case. Evidence of Lewis' relationship to Reckless and Piru, his violent rap lyrics, text messages about guns and shootings, and pictures of himself with guns and flashing gang hand signs, while having little to no bearing on the underlying charges, no doubt inflamed the jury and tarnished Lewis' credibility in the jurors' minds. This panoply of generic, gang-related evidence created a "real danger that the jury would improperly infer that [Lewis] had a criminal disposition." (*People v. Cardenas* (1982) 31 Cal.3d 897, 905.) The prosecution increased this risk at closing, telling the jury to look at the data from Lewis' cellphone "to reveal who [Lewis] is . . . [a] gangster or a wannabe gangster." Jones' counsel similarly encouraged the jury to view the gang-related evidence impermissibly and prejudicially, proclaiming the material from Lewis' cellphone "shows the character of [ ] Lewis." Again, the People seemed to urge the jurors to conflate Lewis' gang membership and activities with an allegiance to Heem, and convict Lewis solely because he was a "gangster," compounding the harmful effect of the evidentiary errors.

Indeed, the People's evidence of intent and motive was far from overwhelming. There was no evidence Lewis was involved in the gangs at issue, beyond his friendship with Watts and the fact that he was sometimes seen with Heem members, and there is no dispute that Lewis was not involved in D.W.'s murder. There was also little evidence that Lewis and Jones were friends or had any prior relationship that would motivate Lewis to kill M.F. on Jones' behalf. Further, the evidence reflected that Lewis was close with M.F., and that they had cared for each other. With respect to the shooting itself, the fact that Lewis shot the lower part of M.F.'s body, such that she was not seriously injured, also suggests that Lewis did not harbor the intent to kill. Thus, the inadmissible

evidence significantly bolstered the People's case, as it allowed them to paint Lewis as a violent, remorseless, gangster, who lacked all credibility.

Of course, Lewis did admit to shooting M.F. twice, leaving her injured in the park, and videos showed him laughing with friends and appearing remorseless in the hours that followed. Thus, it is conceivable that these errors could have been harmless under *Watson* had the jury received proper limiting instructions. Unfortunately, the jury instructions addressing the cellphone and gang-related evidence was ambiguous, at best, as applied to Lewis.

The jury was instructed with a version of CALCRIM No. 375, which simultaneously addressed Jones' uncharged crimes from 2014, the content on Lewis' cellphone, and Lewis' affiliations with Reckless and Piru. It first lists Jones' 2014 offense, where he brandished a firearm in the park. It then states: "The People presented evidence about Heem and Squad" and evidence of "Jones' alleged association with Heem." Below that it states: "The People presented evidence about defendant Lewis' activities and writing found in the Notes app, videos and photographs showing guns from his cellphone. There was also evidence presented of defendant Lewis' alleged association with East Side Pirus and Reckless. This evidence may only be considered as to defendant Lewis, not to defendant Jones." It goes on to explain that the People must prove "that the defendant in fact committed the offenses and acts" by a preponderance of the evidence. It does not define the "offenses and acts."

Directly below, it states, "If you decide that a defendant committed the offenses and acts, you may, but are not required to" consider the evidence to determine whether "[t]he defendant acted with the intent to kill" or "[t]he defendant had a motive" to commit the offenses. When doing so, the jury is instructed to "consider the similarity or lack of similarity between the uncharged offenses and acts and the charged offenses." Thus, though not a model of clarity, the instruction has at this point told the jury to

consider Lewis' gang affiliations and cellphone evidence for purposes of his intent or motive.

However, the instruction then states: "*Do not consider this evidence for any other purpose except for the limited purpose of determining defendant Lewis' character trait for aggressiveness*. Do not conclude from this evidence that [ ] Jones has a bad character. Do not conclude from this evidence that the defendants are disposed to commit crimes." (Italics added.) Consequently, the jury is told to consider Lewis' gang associations and cellphone evidence for the limited purpose of assessing Lewis' intent and motive, yet simultaneously told to *only* consider that *same evidence* for the purpose of determining Lewis' character trait for aggressiveness. This is problematic in multiple ways. First, the jury is instructed to use the same evidence for two different, mutually exclusive purposes. This renders the instruction contradictory, making it impossible for the jury to understand how to use the evidence. Second, the cellphone and gang evidence should have been parsed in the instructions so that the jury knew to use it for the different purposes assigned by the trial court. While some of the evidence was admitted solely for purposes of motive and intent (Lewis' rap lyrics, for example), other evidence (i.e., the gun photographs) was admitted for the jury to consider regarding Lewis' character trait for aggressiveness. Lumping the evidence together into a single instruction in this manner creates the risk of two unacceptable outcomes. On the one hand, the jury could have used the motive and intent evidence as impermissible character evidence of aggressiveness. Alternatively, the jury could consider the rebuttal evidence as evidence of intent and motive. Either way, the jury instructions greatly magnified the chance that the jury used the evidence incorrectly, such that we cannot have any confidence that the jury properly considered the evidence when reaching the verdict in Lewis' case.[7]

---

[7]   The inclusion of CALCRIM No. 350 does not cure the error. The jury was instructed, "You have heard character testimony that defendant [ ] Lewis was not

34

Based on the foregoing, we conclude that absent the erroneous admission of evidence, it is reasonably probable that Lewis would have received a more favorable verdict. Reversal is thus required.

## III

### *Sentencing*

Lewis raises two arguments on appeal regarding sentencing. First, he contends that the trial court abused its discretion by imposing the maximum term of Lewis' firearm enhancement without adequately considering his youth and childhood trauma. He further argues that his case must be remanded for resentencing following the enactment of Assembly Bill 518. As we are reversing Lewis' convictions, his sentence also will be vacated, and we therefore need not substantively address these arguments. However, we note that if Lewis is ultimately resentenced, the trial court must apply all current, pertinent legislation at sentencing.

## VI

### *Jones' Uncharged Act*

We next turn to Jones' arguments on appeal. First, Jones asserts the trial court abused its discretion by permitting Deputy Powe's testimony of an uncharged incident from 2014, in which Jones brandished a firearm at the park during a conflict between Heem and Squad. He contends that allowing Powe to testify about this incident was

---

aggressive. Evidence of defendant Lewis' character trait for lack of aggressiveness can by itself create a reasonable doubt whether defendant Lewis committed [the crimes]. However, evidence of defendant Lewis' good character may be countered by evidence of his bad character for the same trait. You must decide the meaning and importance of this evidence. You may take that testimony into consideration along with all other evidence in deciding whether the People have probed that defendant Lewis is guilty beyond a reasonable doubt." It would not be clear to the jury how this instruction fits in with the version of CALCRIM No. 375 used in this case, which suggested the jury could also use the gun-related evidence for purposes of motive and intent.

impermissible under sections 352 and 1101. We conclude the trial court acted within its discretion by permitting Powe's testimony on this subject.

### A.    Additional Procedural and Factual History

### 1. The Trial Court's Ruling

Following Deputy Powe's section 402 hearing, the trial court ruled, over Jones' objection, that Powe could testify regarding his firsthand experience of an October 9, 2014, incident involving Jones and a firearm. The trial court found that evidence of Jones brandishing a gun in an altercation with the brother of a known Squad member was "relevant and probative of Jones' motive and intent in the homicide of a member of Squad." It further found minimal risk of prejudice, as there was little chance the jury would have a visceral emotional reaction to the incident, or that it would conclude solely from the incident that Jones murdered D.W. or sought to murder M.F.

### 2. The Prior Uncharged Acts

At trial, Deputy Powe testified that on October 9, 2014, Powe heard a report of a physical fight at another park near the campus. When Powe drove by the park, he did not see anyone fighting but saw a large group of people. Later that afternoon, Deputy Powe learned that a Sheldon High School student, Foster, had reported seeing two individuals with a gun at the park. Powe spoke with Foster about the incident. Foster explained that he had gone to the park planning to fight Jones and Daniel because they had hit his brother, who was associated with Squad, the week prior. Foster told Powe that Jones and Daniel arrived at the park with their mother and an adult male. However, Foster declined to fight when he saw a firearm in the waistband of Daniel's pants. Daniel then handed the firearm to Jones. While holding the firearm, Jones repeatedly challenged Foster to fight, but Foster refused. Daniel and Jones eventually approached the car belonging to Foster's friend, Simpson. Daniel and Jones briefly entered the vehicle. At some point, the man who had accompanied Daniel and Jones to the park ordered Daniel and Jones "to put the gun away and fight one on one." Daniel and Simpson then fought each other.

36

Later that evening, officers went to Daniel and Jones' home. During a search of Jones' bedroom, officers found a .38-caliber revolver hidden behind a mattress. Jones told Deputy Powe the gun belonged to one of his brothers but admitted that he had been carrying the gun in the park earlier that day. The officers also found Simpson's wallet and identification in Daniel's bedroom.

### 3. Jury Instructions

Directly following Deputy Powe's testimony of this incident, the trial court orally instructed the jury: "You've heard evidence of an uncharged act or offense. You may, but are not required to, consider that evidence for the limited purpose of deciding whether [ ] Jones had a motive to commit the offenses alleged in this case. In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and acts and the charged offense. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining whether or not defendant had a motive to commit the charged crimes. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] You'll be given more, additional instructions mid-trial on how this evidence may be used."

After both sides rested, the trial court instructed the jury with the modified version of CALCRIM No. 375 discussed *ante*. With respect to Jones, the instruction explained that the jury could consider Jones' offense of "possession of a firearm and brandishing a firearm in the park in 2014" if the People proved the offense by a preponderance of the evidence. If so, it said that the jury may only consider the evidence for the limited purpose of deciding whether Jones had the intent to kill or the motive to commit the offenses in this case. It stated, "Do not conclude from this evidence that defendant [ ] Jones has bad character" or that he was "disposed to commit a crime." It further stated that the evidence was only one factor to consider along with the other evidence and was not sufficient by itself to prove guilt of any of the charged counts.

### 4. *Applicable Legal Standards*

Evidence the defendant has committed crimes not charged in the operative case is inadmissible to prove the criminal disposition or propensity of the accused. (§ 1101, subd. (a).) However, section 1101, subdivision (b) permits evidence of a defendant's uncharged crimes when such evidence is relevant to prove some fact at issue in the case, such as identity, intent, or the existence of a common design or plan. (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) The relevance of the uncharged crimes is determined by the nature and degree of the similarity between such misconduct and the charged crime. (*People v. Leon* (2015) 61 Cal.4th 569, 598.) " 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' [Citation.]" (*Ibid.*)

If the trial court determines the uncharged act is admissible under section 1101, subdivision (b), it must then engage in a balancing of probative value versus the risk of prejudice under section 352 before finding the evidence admissible. (*People v. Thomas* (2011) 52 Cal.4th 336, 354.) "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211.)

" 'We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion.' [Citation.]" (*People v. Leon, supra*, 61 Cal.4th at p. 597.)

### 5. *Analysis*

The trial court did not abuse its discretion by admitting evidence of Jones' uncharged acts. The prosecution sought to prove that Jones was motivated by his allegiance to Heem, and by Heem's longstanding feud with Squad, to conspire with other Heem members to murder D.W. Evidence that Jones (a Heem member) repeatedly challenged Foster (the brother of a Squad member) to fight at the park while brandishing a firearm, suggests that Jones was willing—or even eager—to engage in violent acts in furtherance of the gang feud. His use of a firearm is also consistent with the weapon used in D.W.'s murder and M.F.'s attempted murder. Although Jones notes that the uncharged act occurred nearly two years before the crimes in this case, two years is not a particularly long amount of time between an uncharged act and a charged crime. (See *People v. Ewoldt* (2001) 7 Cal.4th 380, 405 [prior uncharged act probative where "only a few years elapsed" between the act and the charged crimes]; *People v. Zepeda, supra*, 87 Cal.App.4th at p. 1212 [five-year gap between uncharged act and a crime does not diminish probative value].) Further, both the uncharged acts and crimes occurred while Jones was a high school student at Sheldon, which renders the gap in time less consequential, as Jones was in the same stage of life and spending his days in the same location during both crimes. In fact, the length of time here speaks to the years of bad blood between the gangs and could be viewed as evidence of Jones' enduring commitment to Heem.

The risk of prejudice was also minimal. The jury was well advised of Jones' association with Heem, and the feud between Heem and Squad, through other evidence presented at trial. Additionally, Deputy Powe's testimony of the uncharged acts was brief and not overly inflammatory, and the uncharged acts (possessing and brandishing a firearm) were far less violent and egregious than the charged crimes (murder, attempted murder, and conspiracy to murder). And, there was little chance the jury would be confused by hearing of Jones' incident with the firearm in the park, or possession

39

thereafter. The CALCRIM No. 375 jury instruction was used to explain how the jury was to use the evidence. Although the instruction was confounding as to Lewis, we find that it was clear as to Jones. It specifically described Jones' uncharged act—"possession of a firearm and brandishing a firearm in a park in 2014"—and stated that the uncharged act could only be used in connection with Jones' motive and intent, and not as evidence of propensity or bad character. Further, the trial court orally instructed the jury how to use the evidence immediately following its presentation. We presume the jury understood and followed the instructions. (*People v. Avila* (2006) 38 Cal.4th 491, 575.)

We accordingly find no abuse of discretion in the trial court's decision on Jones' uncharged acts. (See, e.g., *People v. Zepeda, supra*, 87 Cal.App.4th at pp. 1211-1212 [affirming admission of uncharged offense as evidence of the defendant's motive and intent to be hostile to someone solely because he is in a rival gang].)

V

*Juvenile Transfer Hearing*

Jones next argues, and the People concede, that he is entitled to a new juvenile court transfer hearing under Assembly Bill No. 2361 (Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a); Welf. & Inst. Code, § 707). We agree with the parties.

When Jones was initially transferred to criminal court, the law required the prosecutor to establish by a preponderance of the evidence that "the minor should be transferred to a court of criminal jurisdiction." (Welf. & Inst. Code, § 707, former subd. (a)(3), as amended by Stats. 2018, ch. 1012, § 1; Cal. Rules of Court, rule 5.770(a).)[8] However, effective January 1, 2023, Assembly Bill 2361 amended Welfare and Institutions Code section 707 to both raise the prosecution's burden of proof for

---

**8** As of the filing of this opinion, the Judicial Council has not revised California Rules of Court, rule 5.770(a) to conform to Welfare and Institutions Code amended section 707.

transferring a juvenile to criminal court, and to require a specific finding. It now states that the court must "find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 707, subd. (a)(3).)

The parties agree, as do we, that Assembly Bill 2361 is retroactive to all cases not yet final on appeal pursuant to *In re Estrada* (1965) 63 Cal.2d 740. We addressed this question in *In re S.S.* (2023) 89 Cal.App.5th 1277, and noted that our Supreme Court had found that similar amendments to Welfare and Institutions Code section 707, "which prohibited prosecutors from charging juveniles with crimes directly in a court of criminal jurisdiction and gave the prosecution the burden of proof at transfer hearings . . . applied retroactively because they effectively reduced the possible punishment for juveniles . . . ." (*In re S.S., supra*, 89 Cal.App.5th at pp. 1288-1289.) As Assembly Bill 2361 "likewise make[s] it more difficult to transfer juveniles from juvenile court, which similarly reduces the possible punishment for juveniles," we concluded in *In re S.S.*—as do we again here—that newly amended section 707 of the Welfare and Institutions Code applies retroactively to a minor's case that is not yet final. (*In re S.S.*, at p. 1289.)

As Jones is retroactively entitled to Assembly Bill 2361's ameliorative benefits, we conditionally reverse the judgment and remand for the juvenile court to conduct a new transfer hearing consistent with the current version of Welfare and Institutions Code section 707.

## VI

### *Penal Code Section 3051*

Finally, Jones contends that his sentence of 52 years to life, as a juvenile, violates the Eighth Amendment's prohibition against cruel and unusual punishment. While he acknowledges that in *People v. Franklin* (2016) 63 Cal.4th 261, our Supreme Court held that the enactment of Penal Code section 3051 has rendered this argument moot, he seeks to preserve the claim for later appeal. As we are bound to follow our high court's

41

decision in *Franklin* (see *Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 455), we must reject Jones' claim.

In *Miller v. Alabama* (2012) 567 U.S. 460 [183 L.Ed.2d 407] the United States Supreme Court held that the Eighth Amendment forbids a state from *mandating* the imposition of a life without the option of parole (LWOP) sentence on a juvenile homicide offender. (*Id*. at p. 479.) While it did not foreclose sentencing a juvenile with an LWOP sentence in homicide cases, it cautioned that the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 480.)

Thereafter, the California Legislature enacted Penal Code section 3051, which, in pertinent part, provides that juvenile offenders sentenced to a term of 50 years to life receive a youth offender parole hearing after 25 years of incarceration. (Pen. Code, § 3051, subd. (b)(3).) At these hearings, the inmate must have a "meaningful opportunity to obtain release." (Pen. Code, § 3051, subd. (e).) In assessing the "growth and maturity" of the inmate, the Board of Parole Hearings may consider statements from those who know the inmate, as well as psychological evaluations and risk assessment instruments that "take into consideration the diminished culpability of youth as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (Pen. Code, § 3051, subd. (f)(1), (2).)

Our Supreme Court held that Penal Code section 3051 renders moot a *Miller* claim that a 50-years-to-life sentence constitutes cruel and unusual punishment, finding that such a sentence is not an LWOP sentence or its functional equivalent. (*People v. Franklin, supra*, 63 Cal.4th at p. 280.) Consequently, as our high court has held that Jones' sentence of 50 years to life does not function as an LWOP sentence under *Franklin*, and thus is not subject to *Miller*, we accordingly reject Jones' claim.

Despite the foregoing, Jones argues that the benefit of a youth offender parole hearing afforded by Penal Code section 3051 is illusory, because the benefit is statutory

42

and subject to change.  He therefore requests that we order a future parole hearing as part of the judgment, such that Jones is guaranteed the law's protections, regardless as to whether it is amended within the next 25 years.  We are aware of no authority, and Jones cites to none, in which the court writes a statutory benefit into a judgment to circumvent possible future legislative authority, or avoid potential, undefined future statutory changes.  We are not inclined to do so here.

## DISPOSITION

Lewis' judgment is reversed, and his case is remanded to the trial court to permit the People to decide whether to retry Lewis.

Jones' judgment is conditionally reversed, and the matter is remanded to the juvenile court for reconsideration under Welfare and Institutions Code section 707, as amended by Assembly Bill 2361.  If the juvenile court determines that transferring defendant's case to adult criminal court is not warranted, our conditional reversal is no longer conditional, and the juvenile court shall conduct all further proceedings to adjudicate the charges against him.  However, if the juvenile court determines that the matter should be transferred back to criminal court, then the judgment is affirmed.


_____\s\_____,
Krause, J.



We concur:



_____\s\_____,
Robie, Acting P. J.



_____\s\_____,
Mauro, J.